# United States Court of Appeals
## For the First Circuit

No. 23-1932

UNITED STATES,

Appellee,

v.

MORENO VIZCAÍNO-PEGUERO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

Jackson B. Whetsel, Assistant Federal Public Defender, with whom Rachel Brill, Federal Public Defender, District of Puerto Rico, and Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appellate Unit, were on brief, for appellant.

William A. Glaser, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Julia M. Meconiates, Assistant United States Attorney, were on brief, for appellee.

May 5, 2026

**BARRON, Chief Judge.** Moreno Vizcaíno-Peguero ("Vizcaíno") appeals his conviction for violating 18 U.S.C. § 922(g)(5)(A), which makes it a crime for "alien[s]" "illegally or unlawfully in the United States" to possess a firearm tied to interstate commerce. He contends that § 922(g)(5)(A), as applied to him, violates the U.S. Constitution's Second Amendment. He therefore argues that the United States District Court for the District of Puerto Rico erred in denying his motion to dismiss his indictment. We affirm.

**I.**

Vizcaíno was indicted in April 2022 in the District of Puerto Rico on a single count of violating § 922(g)(5)(A). He moved to dismiss the indictment in September 2022 on Second Amendment grounds. The District Court denied the motion in an April 2023 opinion and order. Vizcaíno pleaded guilty in June 2023 to violating § 922(g)(5)(A).[1] The District Court sentenced him to thirty months in prison with a three-year term of supervised release to follow. Vizcaíno timely appealed his conviction.

---

[1] Both parties agree that Vizcaíno's guilty plea does not prevent him from challenging the constitutionality of § 922(g)(5)(A) on appeal. See Class v. United States, 583 U.S. 174, 178 (2018).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Under New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), a court faced with a Second Amendment challenge to a firearm regulation must "first consider whether 'the Second Amendment's plain text covers'" the regulated conduct. Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 43 (1st Cir. 2024) (quoting Bruen, 597 U.S. at 17), cert. denied, 145 S. Ct. 2771 (2025). If the Second Amendment's plain text does, then "the government bears the burden of demonstrating that the challenged regulation is consistent with this Nation's historical tradition of firearm regulation." United States v. Minor, 165 F.4th 616, 621 (1st Cir. 2025) (citation modified). Our review is de novo as to each step of the Bruen framework. See id.

**A.**

With respect to the first step of the Bruen framework, the government argued, in response to Vizcaíno's motion to dismiss his indictment, that the Second Amendment's plain text did not cover him because -- by virtue of his being an "alien"[2] illegally or unlawfully in this country -- he was not among "the people" to

___

[2] We use the term "alien" throughout this opinion for consistency with the text of 18 U.S.C. § 922(g)(5)(A).

whom the Second Amendment refers. Vizcaíno argued otherwise because he had lived and worked in this country for years.

The District Court determined that it did not need to resolve the parties' dispute over the meaning of the phrase "the people" because it concluded that, even if that phrase included Vizcaíno, his challenge to § 922(g)(5)(A) still failed at the second step of the Bruen framework. That was so, the District Court explained, because § 922(g)(5)(A) is consistent with the "tradition of disarming certain groups seen as threatening or suspect" to the regulating government.

The government agrees with the District Court that Vizcaíno's challenge fails at the second step of the Bruen framework. It nonetheless urges us to affirm his conviction based on that framework's first step. In support of that contention, the government argues that, under District of Columbia v. Heller, 554 U.S. 570, 580 (2008), "the term ['the people'] unambiguously refers to . . . members of the political community." (Alterations in original.) It goes on to assert that aliens are not part of that "community."

The government seeks to bolster its position by pointing to the fact that Heller described the Second Amendment right to keep and bear arms as belonging to "Americans," e.g., id. at 581, and "citizens," e.g., id. at 595, 625, 630. It further contends that, based on the Supreme Court's use of the term "law-abiding

- 4 -

citizen" in Bruen to describe those the Second Amendment protects, see 597 U.S. at 9, 29-30, the Supreme Court there "confirmed . . . that the right to keep and bear arms belongs only to ordinary, law-abiding citizens."

Some circuits have relied on logic similar to the government's in ruling that "the people" to whom the Second Amendment refers does not include any aliens illegally or unlawfully in the United States. See United States v. Sitladeen, 64 F.4th 978, 984-85 (8th Cir. 2023) ("[U]nlawfully present aliens are not within the class of persons to which the phrase 'the people' refers."); United States v. Carpio-Leon, 701 F.3d 974, 979, 981 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given."); United States v. Portillo-Munoz, 643 F.3d 437, 440-42 (5th Cir. 2011) ("[T]he phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States . . . ."). But that conclusion is not a unanimous one among our sister circuits. Others faced with Second Amendment challenges to § 922(g)(5)(A) have either held or assumed that "the people" does include aliens who are in this country illegally or unlawfully but who have lived here for a significant period. See United States v. Escobar-Temal, 161 F.4th 969, 977 (6th Cir. 2025) ("[T]he Second Amendment's reference to 'the people' encompasses unlawfully

- 5 -

present individuals with sufficient connections to the national community . . . ."); United States v. Carbajal-Flores, 143 F.4th 877, 882 (7th Cir.) (similar), cert. denied, 146 S. Ct. 826 (2025) (mem.); United States v. Perez, 6 F.4th 448, 453 (2d Cir. 2021) (assuming without deciding that aliens unlawfully in the United States are part of "the people"); United States v. Vazquez-Ramirez, 163 F.4th 706, 709 (9th Cir. 2026) (per curiam) (same); United States v. Duque-Ramirez, 161 F.4th 1237, 1245 (10th Cir. 2025) (same); United States v. Jimenez-Shilon, 34 F.4th 1042, 1045-46 (11th Cir. 2022) (same). These circuits have thus proceeded to Bruen's second step to resolve such challenges. See, e.g., Escobar-Temal, 161 F.4th at 978.

In proceeding in that manner, several of those circuits have noted that in Heller itself the Court relied on its prior decision in United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), in explaining that

> 'the people' seems to have been a term of art employed in select parts of the Constitution . . . . [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

554 U.S. at 580 (alterations in original) (quoting Verdugo-Urquidez, 494 U.S. at 265); see, e.g., Carbajal-Flores, 143 F.4th at 881-82. For that reason, these circuits have concluded, it is not evident how Heller can be read to establish that, as the government would have it, "the people" to whom the Second Amendment refers excludes all aliens and so, necessarily, all aliens who are in this country illegally or unlawfully.[3] See, e.g., Jimenez-Shilon, 34 F.4th at 1044-46.

We see the force of these circuits' reasoning. Verdugo-Urquidez does not itself hold that an alien who is in this country "illegally or unlawfully" necessarily lacks sufficient connection with it to be considered part of "the people" for purposes of the Fourth Amendment. In fact, in Verdugo-Urquidez, the Court expressly left open the possibility that such a person may be able to develop a sufficient connection to be among "the people" to whom the Fourth Amendments refers. See Verdugo-Urquidez, 494 U.S. at 271-73.

---

[3] Notably, insofar as Vizcaíno's unlawful presence in this country is not in and of itself a bar to his having a sufficient connection to this country to be part of the national community -- and thus "the people" to whom the Second Amendment refers -- the government does not argue that he nonetheless lacks such a connection for some additional reason, such as his having been present here for only a short time or his having failed to have made ties to his community while here. Thus, insofar as unlawful presence alone does not preclude Vizcaíno from being part of "the people," the government's argument disputing his Second Amendment challenge to § 922(g)(5)(A) hinges on the second step of the Bruen framework, not the first.

The government does emphasize that we must follow the Supreme Court's "considered dicta," Brito v. Garland, 22 F.4th 240, 248 (1st Cir. 2021) (quoting United Nurses & Allied Professionals v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020)), and directs our attention to the references in Heller and Bruen that the Second Amendment right belongs to "all Americans," Heller, 554 U.S. at 581, and "citizens," Bruen, 597 U.S. at 30-32. On their face, however, those references concern only whom the phrase "the people" includes, not whom that phrase excludes, as the individuals asserting their Second Amendment rights in each of those cases were citizens of this country. Bruen, 597 U.S. at 15; Complaint at 2-4, Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004) (No. 213-001). And, of course, Heller's discussion of Verdugo-Urquidez -- which indicates that a person who is not a citizen of this country must have a "sufficient connection" to it to be counted as part of "the people," Verdugo-Urquidez, 494 U.S. at 265, 271-73 -- is itself considered dicta that we are not free to disregard. See Heller, 554 U.S. at 580; Brito, 22 F.4th at 248.

In any event, the principle of constitutional avoidance points against our deciding in this case whether "the people" to whom the Second Amendment refers excludes all persons who are not citizens of the United States -- or even only such persons who are here illegally or unlawfully -- if it is not necessary for us to

- 8 -

do so to resolve Vizcaíno's challenge to his § 922(g)(5)(A) conviction.  Cf. ACLU of Mass. v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 52 (1st Cir. 2013) ("[F]ederal courts are not to reach constitutional issues where alternative grounds for resolution are available."); Mills v. Rogers, 457 U.S. 291, 305-06 (1982) (invoking "policy of restraint" to "avoid unnecessary decisions of constitutional issues").  The dicta in Heller discussing Verdugo-Urquidez expressly links "the people" in the Second Amendment to that same phrase in the First, Fourth, Ninth, and Tenth Amendments.  Heller, 554 U.S. at 580.  As a result, a holding about the meaning of "the people" at Bruen's first step would not necessarily be a holding merely about the meaning of that phrase in the Second Amendment.  It would implicate the meaning of that phrase in constitutional amendments that Vizcaíno is not himself relying on in this appeal.  And while we acknowledge that resolving this appeal at Bruen's second step also necessarily decides a question of constitutional law, prudence guides us to do so on the ground that confines our focus to the meaning of one constitutional amendment rather than extends it to the meaning of several of them.

Thus, because we conclude, like the District Court, that Vizcaíno's Second Amendment challenge to his conviction may be resolved at the second step of the Bruen framework, we limit the analysis that follows to a consideration of that step alone.  We emphasize in proceeding in this way, though, that, as then-Judge

Barrett explained in her dissent in Kanter v. Barr, even if a "certain group[] of people" does not fall "entirely outside the Second Amendment's scope," the question remains as to whether "history and tradition support[s] Congress's power to strip" that group "of that right." 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J., dissenting). In other words, we agree with the Sixth Circuit that, at least as a matter of logic, "a group may be historically excluded from the right to bear arms while, nonetheless, being part of 'the people.'" Escobar-Temal, 161 F.4th at 975.

Accordingly, our decision to bypass the parties' dispute at Bruen's first step by assuming that Vizcaíno has the better view of it in no way suggests that he similarly has the better view at the second step of Bruen's framework. At that step, we must decide the separate issue of whether § 922(g)(5)(A) "is consistent with this Nation's historical tradition of firearm regulation," Bruen, 597 U.S. at 17, which could be the case even if "the people" includes individuals like Vizcaíno.

**B.**

As we noted at the outset of our analysis, at the second step of the Bruen framework, the government, not Vizcaíno, has the burden to show that § 922(g)(5)(A) comports with this country's tradition of firearm regulation. Id. The government therefore

- 10 -

must identify historical analogues to § 922(g)(5)(A) that suffice to show that such an encompassing historical tradition exists.

In its post-Bruen decision in United States v. Rahimi, 602 U.S. 680, 692 (2024), the Supreme Court clarified the nature of the second-step inquiry. It explained that the inquiry "involves considering whether" the government has shown that "the challenged regulation is consistent with the principles that underpin our regulatory tradition" -- that is, "whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." Id. (citation modified). Rahimi made clear as well that the "[w]hy and how the regulation burdens the right are central to this inquiry," as the historical analogues must be analogous to the challenged regulation in both why they regulated firearms and how they did so. Id.[4]

At the same time, Rahimi makes clear that the historical analogues that the government presents "need not be . . . 'dead ringer[s]' or . . . 'historical twin[s]'" for the challenged regulation. Id. (quoting Bruen, 597 U.S. at 30). Even "when a

---

[4] Rahimi had not been decided at the time that the District Court denied Vizcaíno's motion to dismiss the indictment on Second Amendment grounds. The parties, however, have fully briefed how Rahimi applies to § 922(g)(5)(A). We thus see no need to remand the pure question of law before us for further consideration in light of Rahimi and proceed to the second step under Bruen, as clarified in Rahimi.

challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster'" if it "comport[s] with the principles underlying the Second Amendment." Id. (quoting Bruen, 597 U.S. at 30).

Put otherwise, the fact that, at Bruen's second step, there are some differences between the historical analogues on which the government relies and the challenged regulation does not preclude that contemporary regulation from fitting within the tradition of firearm regulation that the claimed historical precursors establish. See id. at 692, 695-99. A lot therefore turns on just how similar the proffered historical analogues must be to the challenged regulation. And, as it happens, the parties disagree about the degree of similarity that there must be between the proffered precursors and § 922(g)(5)(A). Accordingly, we begin our step-two inquiry by addressing that dispute.

**1.**

Vizcaíno contends that in his specific case the government must show a "distinctly similar historical regulation" to § 922(g)(5)(A) to meet its burden at Bruen's second step. (Quoting Bruen, 597 U.S. at 26.) He argues that this is so because societal concerns attending immigration and naturalization have persisted since the founding era, such that § 922(g)(5)(A) does not address a wholly new societal concern. Rather, in his view,

it addresses an enduring societal concern and so one for which a "distinctly similar" precursor could be expected to be found. See Bruen, 597 U.S. at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

The government convincingly argues, however, that § 922(g)(5)(A) was enacted against the backdrop of our modern legal framework for immigration, which disparately regulates classes of aliens based on whether their presence in the United States is lawful or not. And, as the government then goes on to correctly note, that framework did not exist until the late 19th century and so emerged only well after the Second Amendment's ratification. See Early American Immigration Policies, U.S. Citizenship & Immigr. Servs. (July 30, 2020), https://www.uscis.gov/about-us/our-history/explore-agency-history/overview-of-agency-history/early-american-immigration-policies [https://perma.cc/L5WR-XFUX].

Because we agree with the government that such a general societal concern regarding aliens who are "illegally or unlawfully in the United States" did not exist until after even the Fourteenth Amendment to the U.S. Constitution had been ratified, we also agree with the government that, to satisfy Bruen's second step, the

- 13 -

government need not proffer historical analogues that burden the right to bear arms in a way that is "distinctly similar," Bruen, 597 U.S. at 26, to § 922(g)(5)(A).  Rather, the government need only proffer ones that are "relevantly similar."  Id. at 29.

**2.**

Vizcaíno separately argues that, even if the government needs to identify historical analogues that are only "relevantly similar" to § 922(g)(5)(A), it has failed to do so.  In proffering what it contends are "relevantly similar" historical analogues, the government relies principally on: the English Bill of Rights, given the distinction that it drew between those who were subjects of the Crown and those who were not; a colonial-era law disarming Catholics unless they swore allegiance to the English sovereign and renounced the authority of the Pope; colonial-era measures forbidding arming Native Americans; founding-era statutes disarming British Loyalists, including nonviolent Quakers; and several early state constitutions that expressly defined the right to keep and bear arms as belonging to citizens.[5]  Based on these materials, the government argues that even prior to the ratification of the Second Amendment there existed a tradition in this country of burdening the right to bear arms for the same

---

[5] We consider the historical record assembled by the parties, including primary and secondary sources as well as the extensive body of caselaw on which they rely that reviews historical materials assembled by the parties in those cases.

reason that § 922(g)(5) burdens that right (out of concern that the group subject to the prohibition lacks sufficient ties to the sovereign that imposed it) and in the same way (via a "blanket prohibition" on the possession of firearms by a "certain group").

Vizcaíno does not dispute that these historical measures were in place before and during the founding era or suggest that the government misdescribes what they provide. Nor does he suggest that there is some other set of historical analogues that the government has ignored that, once considered, undermine its position. Instead, he argues only that the government is wrong to contend that these asserted historical analogues are "relevantly similar" to § 922(g)(5)(A).

As we will explain, we agree with the government that § 922(g)(5)(a), even though it is not identical to past regulatory measures, "fits neatly" within the historical tradition of firearm regulation that the government identifies. Rahimi, 602 U.S. at 698. And, we note, thus far, every circuit to have canvassed the history of firearm regulations in this country prior to the Second Amendment's ratification[6] -- including by reviewing the specific historical materials that the government relies on here -- has

---

[6] Our focus is on pre-ratification history based on the historical record assembled by the parties. In so focusing, we do not purport to limit the Bruen analysis to pre-ratification history. Cf. Bruen, 597 U.S. at 20, 37-38 (recognizing potential relevance of post-enactment history).

- 15 -

reached that same conclusion.  See United States v. Escobar-Temal, 161 F.4th 969, 978-85 (6th Cir. 2025); United States v. Carbajal-Flores, 143 F.4th 877, 883-89 (7th Cir.), cert. denied, 146 S. Ct. 826 (2025) (mem.); United States v. Vazquez-Ramirez, 163 F.4th 706, 710-12 (9th Cir. 2026) (per curiam); United States v. Duque-Ramirez, 161 F.4th 1237, 1247-49 (10th Cir. 2025); United States v. Jimenez-Shilon, 34 F.4th 1042, 1046-49 (11th Cir. 2021).

As these courts have explained, this historical tradition traces back to Blackstone, carries forward into the American colonies, extends into the founding era, and encompasses -- in why and how it regulated firearms -- the ban on firearm possession by a category of persons like the category that § 922(g)(5)(A) covers.  See Escobar-Temal, 161 F.4th at 978-81; Carbajal-Flores, 143 F.4th at 883-88; Vazquez-Ramirez, 163 F.4th at 710-11; Duque-Ramirez, 161 F.4th at 1247-48; Jimenez-Shilon, 34 F.4th at 1046-49.  Vizcaíno does advance several arguments on appeal as to why we must conclude otherwise.  As we will explain, those arguments are not persuasive.

**3.**

Vizcaíno first focuses on the "why" part of Bruen's second-step inquiry.  He contends that § 922(g)(5)(A) is not relevantly similar to the government's proffered historical analogues along the "why" dimension because they reveal only a tradition of firearm regulation that targeted groups -- Native

- 16 -

Americans, Catholics, and British Loyalists -- "perceived dangerous due to ongoing hostilities" with (then-colonial) governments or "suspected of being a threat to government." By contrast, he contends, § 922(g)(5)(A) is aimed at "crime control" and so does not purport to regulate firearm possession based on the targeted group posing a threat to the sovereign comparable to the threats posed by the groups historically barred from possessing firearms.

We do not understand the historical materials on which the government relies, however, to reveal a tradition of firearm regulation aimed only at restricting firearm possession by groups engaged in "ongoing hostilities" with the regulating sovereign. Rather, we agree with our sister circuits who, after reviewing the relevant history, have been careful to explain that it reflects "a long tradition . . . linking the right to bear arms with one's allegiance to the sovereign." Carbajal-Flores, 143 F.4th at 887; accord Duque-Ramirez, 161 F.4th at 1247-48 ("There is a tradition, beginning in England and enduring into the founding era, of disarming individuals presumed to be loyal to a foreign sovereign who had not sworn their allegiance via a method prescribed by the legislature.").

Of course, aliens in this country illegally or unlawfully do owe a temporary allegiance to it that makes them subject to our laws. See The Schooner Exchange v. McFaddon, 11

- 17 -

U.S. (7 Cranch) 116, 144 (1812).  Indeed, that is presumably why Vizcaíno is invoking the Second Amendment to challenge his conviction: He does not dispute that the federal statute at issue otherwise applies to him.

As the Seventh Circuit explained, however, in tracing the origins of our Second Amendment right, aliens merely present in the King's dominion were afforded "fewer rights" in the English common-law tradition than were the King's subjects. Carbajal-Flores, 143 F.4th at 883.  And that was so precisely because such foreigners lacked the kind of allegiance to the King that British subjects owed even when those subjects were themselves foreign-born.  Id.; see also 1 William Blackstone, Commentaries *369-70 (distinguishing between the "natural" and "perpetual" allegiance owed by subjects of the sovereign and the "local" and "temporary" allegiance owed by aliens in the sovereign's territory).  This consequence followed from the doctrine of allegiance, which recognized a reciprocal relationship of loyalty and protection between subject and sovereign beyond the temporary allegiance owed by anyone merely present in the King's dominion. See Blackstone, supra, at *366, *368-72.  Thus, the Seventh Circuit continued, "the English tradition establishes a historical pattern of disarming persons who lacked allegiance to the sovereign.  Importantly, though, an individual could overcome that

limitation by swearing an oath [of allegiance] to the sovereign." Carbajal-Flores, 143 F.4th at 884.

Evidence from the colonial and founding eras further demonstrates, as our sister circuits have noted, that "governments consistently conditioned the ability to possess firearms on one's loyalty to the sovereign. People outside the polity were regularly disarmed unless and until they swore an oath of allegiance." Id. at 886; accord Duque-Ramirez, 161 F.4th at 1247-48; Escobar-Temal, 161 F.4th at 980 (discussing how loyalty to the government was "the deciding factor for gun ownership" because the founding generation "maintained the [traditional] assumption that one should not allow individuals loyal to a foreign sovereign or unregulable by domestic sources to possess firearms"). These loyalty-based regulations included measures that disarmed groups even though the groups did not pose "a tendency toward violence," such as Quakers and Native American tribes on friendly terms with the colonists. Escobar-Temal, 161 F.4th at 981.

Thus, there is a "subtle" principle that underpins the historical evidence that the government cites, which the Sixth Circuit aptly summarized as follows:

> [A] group may have been dangerous enough to
> disarm in the eyes of the Founders, not
> because individuals within that group were
> inherently dangerous . . . but because the
> group did not have a sufficient connection to

the sovereign government to provide that government confidence in its ability to regulate the group's conduct with guns.

Id.

That is not to deny that some of the historical measures on which the government relies do relate to threats posed by those belonging to groups engaging in "ongoing hostilities" against the sovereign seeking to disarm them. See id. A survey of the historical landscape reveals, however, a distinct concern about "lack of sovereign control" over groups without a sufficient relationship to the sovereign seeking to disarm them. Id. And the resulting firearm regulations, as the Sixth Circuit well explained, "reflect the importance governments historically placed on ensuring that those who owned guns within [their] borders" were known to the government to recognize its authority, id. at 982, particularly for those "presumed to retain loyalties to a foreign sovereign," Duque-Ramirez, 161 F.4th at 1248; see also Carbajal-Flores, 143 F.4th at 884-85 (explaining that Catholics disarmed in the 17th and 18th centuries were perceived as owing allegiance to a foreign sovereign).

For these reasons, we do not agree that the government has failed to meet its burden to identify "relevantly similar" historical analogues to § 922(g)(5)(A) with respect to "why" they burdened the right to keep and bear arms. Aliens who are illegally or unlawfully present in this country are not as a group in any

sense associated with "ongoing hostilities" with the United States in the way that some of the groups targeted by the government's historical analogues arguably were. But, like the groups targeted by the historical analogues on which the government relies, such aliens have presumptive allegiance to a foreign state and, precisely because of their failure to have obtained a lawful immigration status, have not established what one of our sister circuits referred to as "a regulable relationship to the government" of this country, Escobar-Temal, 161 F.4th at 978.

As was observed by that Circuit, which upheld § 922(g)(5)(A) against a Second Amendment challenge, the provision, in targeting aliens who are in this country illegally or unlawfully, disarms a group that "exist[s] 'largely outside the formal system of registration, employment, and identification'" and so may be "harder to trace." Id. at 984 (quoting United States v. Huitron-Guizar, 678 F.3d 1164, 1170 (10th Cir. 2012)). Moreover, those in that group, due to their lack of lawful immigration status, "have an inherent incentive to evade detection by law enforcement." Id. We therefore conclude that § 922(g)(5)(A) fits within our nation's tradition of firearm regulation based on the historical analogues on which the government relies, as it is a regulation that disarms a group of aliens determined by the legislature to pose a danger because they

are "seen as lacking a regulable relationship to the government."
Id. at 978.

**4.**

Vizcaíno separately argues that § 922(g)(5)(A) is not "relevantly similar" to historical firearm regulations along the "how" dimension. Here, he contends that individuals subject to the Catholic and British Loyalist disarmament measures could get their rights to possess firearms restored by simply taking an oath of allegiance. In contrast, he claims, aliens unlawfully present in the United States are wholly banned from possessing firearms under § 922(g)(5)(A), with no means of gaining back that right.[7]

Vizcaíno is right that the provisions disarming Catholics and British Loyalists allowed individuals to restore their right to bear arms by swearing their allegiance to the relevant government authority in the manner prescribed by that authority. See Carbajal-Flores, 143 F.4th at 884-86. It was

---

[7] Part of the premise of Vizcaíno's argument -- that § 922(g)(5)(A) is an "absolute ban on firearm possession" by aliens illegally or unlawfully in the United States -- appears to be wrong. For example, not all guns are subject to the prohibition. See 18 U.S.C. § 921(a)(3) (excluding "antique firearm[s]" from the statutory definition of "firearm"); id. § 922(g) (flush language) (limiting prohibition to possession of firearms "in or affecting commerce"). In addition, prohibited persons may apply to the Attorney General for relief. Id. § 925(c). We acknowledge that the process for such relief was unavailable until recently, and so Vizcaíno could not have availed himself of it. See 90 Fed. Reg. 13080, 13082-83 (Mar. 20, 2025). Regardless, the possibility of such relief does not change our conclusions here.

- 22 -

understood that, by swearing such allegiance, an individual entered into the requisite regulable relationship with the government and so was no longer among the group of individuals targeted by disarmament laws. After all, there was no reason to presume the group member lacked the allegiance that gave rise to the concern justifying disarmament once they had pledged such allegiance. Indeed, such group members were all otherwise here lawfully and permanently.

Vizcaíno is also right that, in consequence of the effect of taking the oath under those claimed precursors, § 922(g)(5)(A) is not a historical twin of them. A person in this country illegally or unlawfully cannot simply take an oath of allegiance to this country and, by that act alone, free himself of the prohibition against possessing a firearm that § 922(g)(5)(A) imposes.

As we have already explained though, § 922(g)(5)(A) need not "precisely match its historical precursors," Rahimi, 602 U.S. at 692, to fall within the tradition of firearm regulation that they establish. Nor need this measure even be "distinctly similar" to those earlier ones to do so. Bruen, 597 U.S. at 26. It need only be "relevantly similar" to them because § 922(g)(5)(A) addresses a general societal concern that is new, in that "[f]ederal control of immigrant admissions did not begin until the late nineteenth century." Escobar-Temal, 161 F.4th at 982.

What is significant, then, is that the point of distinction here along the "how" dimension is directly related to the new societal concern that relieves the government of the need to identify measures that otherwise more precisely match § 922(g)(5)(A). Section 922(g)'s prohibition against someone like Vizcaíno possessing a gun terminates once that person gains United States citizenship or acquires lawful immigrant status. See 8 U.S.C. § 1448 (naturalization oath of renunciation and allegiance); cf. 18 U.S.C. § 922(g)(5)(B) (prohibiting firearm possession by certain aliens admitted under nonimmigrant visas). That makes it relevantly similar to the measures that came before. An alien here illegally or unlawfully must do much more than take an oath of allegiance to this country to be free of the disability that § 922(g)(5)(A) imposes, unlike the Catholics and British Loyalists targeted by the claimed historical analogues. But aliens illegally or unlawfully in the United States would, even upon taking an oath of allegiance, still "exist 'largely outside the formal system of registration, employment, and identification,'" Escobar-Temal, 161 F.4th at 984 (quoting Huitron-Guizar, 678 F.3d at 1170). And so they still would "lack[] a regulable relationship to the government." Id. at 978. We therefore conclude that § 922(g)(5)(A)'s prohibition is relevantly similar to the proffered regulations disarming Catholics and British Loyalists in "how" it operates, as it too persists only

- 24 -

until the individuals that it targets take steps to ensure that they have entered into the kind of relationship with the government that is otherwise lacking.

We do recognize that, as Vizcaíno contends, the government's proffered analogue regarding the prohibition on arming Native Americans, insofar as it prohibited sales of firearms to Native Americans rather than ownership of firearms by Native Americans, appears to operate differently than § 922(g)(5)(A). But the Native-American-based analogue just provides support for the proposition that the founding generation understood the government to have an interest, permissible under the Second Amendment, in minimizing firearm ownership among people who existed outside the sovereign-citizen relationship. See Escobar-Temal, 161 F.4th at 979 (explaining that Native Americans were considered "resident aliens" in the American colonies). As we explained above, wholly apart from the proffered laws banning the sale of firearms to Native Americans, the government has met its burden to show a historical tradition of outright prohibition on firearm ownership by individuals who lack the necessary relationship of allegiance with the sovereign imposing the ban. And, in any event, some early American colonies did more to limit firearm possession by Native Americans than simply prohibiting the trade of arms with them. See Act of Jan. 22, 1677, reprinted in 2 Records of the Colony of Rhode Island and Providence Plantations,

- 25 -

in New England, 1664-1667 561 (John R. Bartlett ed., 1857)(ordering colonists to seize from Native Americans within the colonial territory any guns or ammunition that they carried); Ordinance of July 1, 1656, reprinted in Laws and Ordinances of New Netherland, 1638-1674 234-35 (E.B. O'Callaghan trans., 1868) (forbidding armed Native Americans from entering the territory and requiring the disarmament of any who did).

**5.**

Vizcaíno's next argument is that the government's attempt to show the requisite tradition of firearm regulation fails because the government relies on precursors that disarmed entire classes of people based on characteristics like religion and race that would be wholly impermissible for the government to rely on today. In support of that argument, Vizcaíno contends that, for that reason, we "should be hesitant to accept as an appropriate analogue any prior law promulgated [based on] general notions of [the] danger or untrustworthiness" of a class of people.

Vizcaíno is undoubtedly correct that many of the analogues that are part of the historical tradition outlined above are predicated on the presumption that certain groups owed allegiance to a foreign sovereign on grounds that today would be clearly unconstitutional and, as the government puts it, "abhorrent." But presuming the existence of such foreign ties on the basis of religion or race would be unconstitutional today due

to limitations that constitutional provisions other than the Second Amendment impose. See Carson v. Makin, 596 U.S. 767, 787 (2022) ("[T]he Free Exercise Clause forbids discrimination on the basis of religious status."); Washington v. Davis, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."). Yet Vizcaíno does not suggest to us that there is a Second-Amendment-based problem with respecting the founding generation's judgment that prohibiting firearm possession by those with foreign ties who have not sworn allegiance to the United States is consistent with the right to bear arms, even when done on a class-wide basis. See Rahimi, 602 U.S. at 698 ("[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse . . . ." (citing Heller, 554 U.S. at 626)). We thus do not see how Vizcaíno's argument on this score undermines the government's contention that the precursors on which it relies establishes a historical tradition of firearm regulation that encompasses § 922(g)(5)(A).

**6.**

Vizcaíno's final argument about why the government has failed to show that § 922(g)(5)(A) fits within our nation's history of firearm regulation draws directly on Rahimi. In this argument,

- 27 -

he draws on that precedent to contend that the Second Amendment requires an individualized finding of dangerousness to disarm a person -- specifically, a finding that the person poses "a credible threat to the physical safety of another." (Quoting Rahimi, 602 U.S. at 702.)

We rejected this very same argument, however, in addressing an earlier Second Amendment challenge to a federal firearm regulation. As we explained there, Rahimi makes clear that, to satisfy the Second Amendment, the government must show only that the challenged measure comports with "the principles that underpin our regulatory tradition." 602 U.S. at 692; see Minor, 165 F.4th at 624 ("[I]t is clear that the Court [in Rahimi] was not holding that a judicial finding of a forward-looking threat is required as a constitutional matter for other subsections of 922(g)." (citing Rahimi, 602 U.S. at 693)); see also Rahimi, 602 U.S. at 702 (explaining that the Court did not "undertake an exhaustive historical analysis of the full scope of the Second Amendment" (citation modified)). And, for the reasons that we have explained, we conclude that the government has done so here.

## C.

In sum, the government has put forth relevantly similar historical analogues to the firearm regulation that Vizcaíno challenges along both the "why" and the "how" dimensions that are central to Bruen's second-step inquiry. Rahimi, 602 U.S. at 692.

The government therefore has shown what it must at <u>Bruen</u>'s second step -- namely, that the challenged regulation fits within a historical tradition of relevantly similar firearm regulations. It follows that, for this reason alone, Vizcaíno's <u>Bruen</u>-based Second Amendment challenge to his conviction fails.

## III.

For the foregoing reasons, the District Court's decision is **<u>affirmed</u>**.